J-S21003-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: D.R., A MINOR | : IN THE SUPERIOR COURT OF |
| | :    PENNSYLVANIA |
| | : |
| APPEAL OF: T.R., FATHER | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : No. 239 MDA 2026 |

Appeal from the Decree Entered January 13, 2026
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  056-ADOPT-2025

BEFORE:  BOWES, J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:                **FILED: AUGUST 6, 2026**

T.R. ("Father") appeals from the decree entered on January 13, 2026, involuntarily terminating his parental rights to his son, D.R., born in July 2016.[1]  Father's court-appointed attorney, Joseph L. Hitchings, Esquire, seeks leave to withdraw his representation pursuant to **_Anders v. California_**, 386 U.S. 738 (1967), and **_Commonwealth v. Santiago_**, 978 A.2d 349 (Pa. 2009).[2]  We grant counsel's petition to withdraw and affirm the underlying decree.

---

[1] By decree also entered on January 13, 2026, the orphans' court involuntarily terminated the parental rights of L.A. ("Mother"), the mother of D.R.  Mother has filed an appeal at 257 MDA 2026, which we address in a separate memorandum.

[2] This Court has extended the **_Anders_** procedure to appeals from decrees involuntarily terminating parental rights.  **_See In re Adoption of B.G.S._**, 240 A.3d 658, 661 (Pa.Super. 2020).

We glean the following facts from the certified record. Father and Mother (collectively, "Parents") have a history of using illegal drugs and residing in a deplorable mobile home. Cumberland County Children & Youth Services ("CYS") first encountered this family in 2020, following a report that Mother had overdosed on opiates in then-four-year-old D.R.'s presence and the family's residence was so "cluttered" as to be impassable. *See* N.T., 1/13/26, at 53-54. After validating those allegations, CYS briefly opened and subsequently closed a case the following year.[3]

A second report, received on October 4, 2024, precipitated the proceedings now before this Court. It alleged that Parents continued to engage in illegal drug use and that their mobile home lacked running water. A CYS caseworker investigated that day and observed that "the floors in the trailer were caving in," and trash was piled so high that a responding police officer "could not walk inside the residence." *Id*. at 25, 53. Father also informed the caseworker that the family used "a porta potty at a local construction site as the bathroom[.]" *Id*. The agency further verified Parents' use of illegal drugs. CYS immediately sought and was awarded emergency protective custody of D.R., who was placed with his maternal great-grandparents under a safety plan.

---

[3] The record does not indicate whether dependency proceedings commenced, but it does not appear that D.R. was adjudicated dependent at that time.

Based on the foregoing, Parents were each charged with one count of endangering the welfare of a child. The orphans' court adjudicated D.R. dependent after a hearing on December 9, 2024, and he remained with his great-grandparents. The court set D.R.'s permanency goal as reunification with Parents, and in furtherance of that goal, Father was required to provide safe and habitable housing for D.R.; obtain a drug and alcohol evaluation and follow treatment recommendations; participate in drug testing; attend supervised visitation; partake in a parenting assessment; and follow all recommendations. *Id*. at 26-29, 31-36.

The orphans' court held the first permanency review hearing on May 12, 2025. By then, Father had completed a parenting assessment, yielding a recommendation that he participate in a parenting skills program conditioned upon securing suitable housing. The court issued a permanency order concluding that Father had made minimal progress toward alleviating the circumstances which necessitated D.R.'s placement.

The second permanency review hearing convened on October 14, 2025. Father had undergone foot surgery that summer, rendering him unable to walk or work for approximately four months. However, the court once again found that Father had made minimal progress toward his placement goals. The day following the hearing, Father tested positive for methamphetamine, cocaine, and fentanyl. D.R. was also relocated from the home of his great-

grandparents, where he had resided for one year, to the home of his maternal grandparents, who wish to adopt him.

On November 6, 2025, CYS filed a petition to involuntarily terminate Father's parental rights in accordance with 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Less than two weeks later, Father pled guilty to endangering the welfare of a child and received an eighteen-month probationary sentence. He also moved into a home with a friend on a temporary basis.

The evidentiary hearing occurred approximately one month later. Then-nine-year-old D.R.'s legal and best interests were represented by legal counsel and a guardian *ad litem*, respectively. D.R. testified *in camera* in the presence of all counsel and expressed his preference to remain in the home of his maternal grandparents until he is "a grown-up." N.T., 1/13/26, at 10.

CYS then presented Sandra Gibson, the CYS caseworker; Jennifer McWilliams, the visitation supervisor at ABC House where Father's supervised visits occurred; and D.R.'s maternal grandmother ("Maternal Grandmother"). Ms. Gibson described the aforementioned October 4, 2024 investigation and confirmed CYS's findings. She explained that since Father never secured suitable housing for D.R., he could not participate in a parenting skills session, and he was unable to bring D.R. to the friend's home because it was not a permanent residence. *Id*. at 33. Ms. Gibson further established that, during the thirteen months of dependency proceedings, Father had failed to obtain any drug and alcohol evaluation. *Id*. at 32. In fact, in addition to testing

positive for illegal substances the day following the October 2025 permanency hearing, eleven days prior to the evidentiary hearing Father also tested positive for cocaine and failed to appear for two subsequent tests. *Id*. at 31-32. In total, out of the twenty-five times Father was called upon to comply with testing, he produced two positive results, three negative results, and twenty failures to appear. *Id*. at 32. Ms. Gibson further acknowledged that Father had surgery on his foot in the summer of 2025, but she did not attribute that injury to his failure to satisfy any permanency goals. *Id*. at 34-35.

Ms. McWilliams ascribed some of Father's missed visits to his foot injury, but also identified employment obligations and lack of transportation as independent reasons. *Id*. at 17. Out of the fifty-three visits offered to Father, Ms. McWilliams attested that he attended twenty-two. *Id*. at 14. He also failed to progress beyond supervised visitation due to the general lack of progression on his goals.

Father testified on his own behalf, represented by Attorney Hitchings.[4] As to housing, he agreed that the mobile home was in an unlivable condition and "beyond repair." N.T., 1/13/26, at 83. He clarified that the friend he then resided with was a temporary housing solution, and he could not have D.R. living permanently there with him. *Id*. at 75-76. When asked "what was the difference between when you could and when you couldn't" make it to

_____

[4] Mother also appeared and testified against her termination.

supervised visits and court hearings, Father responded, "[m]ostly — well, recently was because of my work schedule. I was working like 10:00 to 6:00, 11:00 to 8:00." *Id*. at 82. Father also stated that he missed drug tests due to his work schedule and he had poor visitation attendance due to "transportation." *Id*. at 83. He had a drug evaluation appointment scheduled for three weeks after the hearing, but was not yet enrolled in a treatment program. *Id*. at 78, 84. He claimed that he would be able to regularly attend mandated drug tests following the hearing because he was starting a new "graveyard shift" job. *Id*. at 76. The court addressed his drug use as follows:

> THE COURT: So you haven't stopped using illicit substances; would you agree with that?
>
> [FATHER]: What I failed for on [January 2, 2026,] isn't something I fought with most of my life. I've dealt with opiates my whole life. That was my biggest battle. That was just New Year's Eve, a mess-up on my part, and I'll take full responsibility for it.
>
> THE COURT: Didn't you [also] test positive for cocaine back in October of 2025?
>
> [FATHER]: Yeah. I don't know why that came up as cocaine because I wasn't using that at the time. It could have been mixed in with the fentanyl. I don't know.

*Id*. at 86-87.

By decree, the orphans' court involuntarily terminated Father's parental rights pursuant to the statutory grounds alleged. Father appealed, and both

- 6 -

he and the orphans' court complied with their respective Pa.R.A.P. 1925 obligations.

As noted, Attorney Hitchings has filed a petition to withdraw and *Anders* brief.  In order to withdraw in accordance with *Anders*, counsel must:

> (1) petition the court for leave to withdraw and aver that, after making a conscientious examination of the record, he has determined that an appeal would be frivolous;
>
> (2) furnish a copy of the *Anders* brief to the appellant; and
>
> (3) advise the appellant that they have the right to retain private counsel or bring additional arguments to the court's attention.

*See In re Adoption of B.G.S.*, 240 A.3d 658, 661 (Pa.Super. 2020) (cleaned up).  Our caselaw further sets forth the substantive requirements for *Anders* briefs, which must:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes would arguably support the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous.

*Id*. at 661 (citing *Commonwealth v. Santiago*, 978 A.2d 349, 361 (Pa. 2009)).

Attorney Hitchings has complied with these obligations.  He submitted a brief pursuant to *Anders* averring that Father's appeal is frivolous, attached a letter advising Father of his right to retain alternative private representation

- 7 -

or raise supplemental arguments on his own, and provided him with a copy of the **Anders** brief. The brief provides a summary of the procedural history and facts, including citations to the certified record, discusses the evidence that counsel believes would arguably support Father's appeal, and sets forth counsel's conclusion that the appeal is frivolous. We therefore proceed to review the merits of the issues outlined in the brief while conducting "an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel." **Id**. at 662 (quoting **Commonwealth v. Flowers**, 113 A.3d 1246, 1250 (Pa.Super. 2015)).

Counsel identifies the following three potential issues to support Father's appeal:

> 1. Whether the [orphans' c]ourt abused its discretion and committed an error of law when it found that sufficient grounds existed for termination of [Father]'s parental rights to his child, despite a lack of clear and convincing evidence, thus contravening [§] 2511(a) of the Adoption Act, 23 Pa.C.S. § 2511(a).
>
> 2. Whether the [orphans' c]ourt abused its discretion and committed an error of law in terminating [Father]'s parental rights when the conditions which led to the removal or placement of the child no longer existed or were substantially eliminated, thus contravening [§] 2511(a) and (b) of the Adoption Act, 23 Pa.C.S. § 2511(a), (b).
>
> 3. Whether the [orphans' c]ourt abused its discretion and committed an error of law in determining it would be in the child's best interest to have parental rights terminated, when [Father], if given sufficient time, would be ready, willing, and able to parent the child and provide for his needs, thus contravening [§] 2511(b) of the Adoption Act, 23 Pa.C.S. § 2511(b).

***Anders*** brief at 4-5 (citations altered).[5]

> We review these matters in light of the following legal principles:
>
> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.
>
> In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

***Interest of M.E.***, 283 A.3d 820, 829-30 (Pa.Super. 2022) (cleaned up).

---

[5] D.R.'s guardian *ad litem* filed a letter in this Court advocating for affirmance of the decree based upon the reasons outlined in the court's Rule 1925(a) opinion.

- 9 -

The involuntary termination of parental rights is governed by § 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id*. at 830; *see also* 23 Pa.C.S. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under any one of these subsections by clear and convincing evidence, the court then assesses the petition pursuant to § 2511(b), which hinges on the child's developmental, physical, and emotional needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). We need only agree with the court's determination as to any one subsection of § 2511(a), in addition to § 2511(b), to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

In the case *sub judice*, we analyze §§ 2511(a)(2) and 2511(b), which provide, in pertinent part, as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .

- 10 -

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511 (provisions not applicable to § 2511(a)(2) omitted).

The grounds for termination under § 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct and may also include acts of refusal and incapacity to perform parental duties. *See In re S.C.*, 247 A.3d 1097, 1104 (Pa.Super. 2021). We have long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa.Super. 2017). At a termination hearing, the orphans' court may properly reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to cooperate with the agency or take advantage of available services during the dependency proceedings. *See In re S.C.*, 247 A.3d at 1105.

The orphans' court concluded that termination was warranted pursuant to § 2511(a)(2) thusly:

Father has failed to remedy the reasons that resulted in D.R. needing to be removed from his care. He is currently living in a home that has not been identified as a home where D.R. could also live. He continues to use and abuse illegal substances, has not sought or obtained drug and alcohol treatment and has not even taken the initial step of obtaining a drug and alcohol evaluation. Father has not been able to complete recommended parenting skills programs as a result of his failure to address his

- 11 -

significant drug and alcohol issues and due to not living in a safe and stable home suited for reunification. Father remains in a relationship with Mother who, at the time of the termination hearing, was not in a position to be reunified with D.R. and could not be reunified with D.R. in the near future. Neither parent has safe, stable[,] or appropriate housing for reunification to occur with D.R. D.R. has now been in care for [fifteen] months with no swift or discernable path to reunification with either of his parents.

Orphans' Court Opinion, 3/16/26, at 10.

In the *Anders* brief, counsel states the fact that Father "had two separate surgeries on his foot" during D.R.'s dependency arguably supports the appeal because it limited his ability to attend drug testing and supervised visitation. *See Anders* brief at 14. Attorney Hitchings further noted that "Father has maintained his employment, located new housing, was consistently visiting and was trying to address his drug and alcohol plan goals" and simply needed "some additional time to meet his permanency goals." *Id*. at 12.

The record supports the trial court's conclusion that Father's repeated and continued incapacity, neglect, or refusal to provide safe and appropriate housing for D.R., to stop using illicit drugs, and to participate consistently in supervised visitation, has caused D.R. to be without essential parental care, control, or subsistence necessary for his physical or mental well-being. Persistent substance abuse continues to plague this family. In addition to missing eighty percent of the drug screens during the life of this case, Father tested positive for cocaine eleven days before the termination hearing and failed to appear for two subsequent tests. *See* N.T., 1/13/26, at 32. Parents'

mobile home remained in an unlivable condition, as Father confirmed, and his temporary housing at his friend's home was not a long-term solution. *Id*. at 75, 83. Ms. McWilliams also verified that Father missed approximately half of the supervised visitation appointments offered. *Id*. at 14. Even accepting that Father's foot surgery contributed to some portion of the missed visits and drug screens, Father's protracted failure to obtain safe housing or meaningfully address his drug addiction is entirely unattributable to any physical limitation.

To the extent Father urged the orphans' court to grant him "a little bit more time" to come into compliance, the court was within its discretion to view those assurances as untimely and disingenuous. *Id*. at 80; *see also In re S.C.*, 247 A.3d at 1105. The evidence therefore reflects that the conditions and causes of Father's incapacity, neglect, and refusal cannot or will not be remedied. As such, we discern no abuse of discretion in the conclusion of the orphans' court that CYS proved the elements § 2511(a)(2), and we agree with Attorney Hitchings that this argument is frivolous.

We now shift to § 2511(b). In reviewing an involuntary termination petition pursuant to this subsection, the court's "primary consideration" is the child's "developmental, physical and emotional needs and welfare." *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023); *see also* 23 Pa.C.S. § 2511(b). This Court has stated that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child."

*In re C.W.U., Jr.*, 33 A.3d 1, 6 (Pa.Super. 2011) (citation omitted). The child's bond with the parent, "plus permanency, stability[,] and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the [§] 2511(b) analysis." *K.T.*, 296 A.3d at 1109. The *K.T.* Court also emphasized that the orphans' court must consider whether, in the context of all these factors, the parental bond is "necessary and beneficial" to the child. *Id*. A bond is considered "necessary and beneficial" if its severance would cause extreme emotional consequences or significant, irreparable harm. *Id*. at 1109-10.

In addition, under the § 2511(b) analysis, courts must "consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268. When weighing the bond considerations, "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*. at 269.

Relevantly, the orphans' court found that D.R. "will not suffer extreme emotional consequences if Father's parental rights are terminated[,] as he demonstrates that he understands adoption for him would mean he gets to grow up in the home of his maternal grandparents[,] and that is what he wanted." Orphans' Court Opinion, 3/16/26, ¶ 23. The court concluded that

- 14 -

D.R.'s developmental, physical, and emotional needs and welfare would be best served by terminating Father's parental rights as follows: "He is in a safe and stable environment in the home of his maternal grandparents[,] and they are committed to providing permanency via adoption and end the devastating holding pattern [D.R.] has been placed into waiting for his parents to get clean and offer him a safe living environment." *Id*. at ¶ 21.

The record supports the court's findings, as there is no evidence that D.R. shares a necessary and beneficial bond with Father. Ms. McWilliams testified that D.R. "would always arrive happy to see [P]arents. . . . [H]e would always hug [Mother] and [Father] both before he left." N.T., 1/13/26, at 16. However, she emphasized that D.R. "likes to come and play" at supervised visitation. *Id*. D.R. "doesn't talk about" seeing Parents. *Id*. at 55. With respect to D.R. and maternal grandparents, Ms. Gibson expressed that D.R. is "not a super affectionate child; but I do see that when he is with" them. *Id*. at 56.

Ms. Gibson opined that there would be no detriment to D.R. if Father's parental rights were terminated. *Id*. at 42. In support, both she and Maternal Grandmother explained that D.R. is doing "very well." *Id*. at 38, 65. For example, a school meeting occurred in December of 2025 with respect to the Individualized Education Program ("IEP") for D.R., who was then in fourth grade. *Id*. at 38. The program included assistance with mathematics and writing, as well as a plan to improve his social behavior, the latter of which

"he is at the goal." *Id*. The IEP also provided him with "appropriate" behavioral responses to problems, and Ms. Gibson attested that the school reported that sixty-five percent of this goal had been met. *Id*. Maternal Grandmother described D.R. as "a great kid. He does struggle with behavior sometimes, in school especially. He loves trains, roller coasters, and we support that for him. He's just a joy to have around." *Id*. at 65. She expressed that D.R. is "very affectionate" with her and her husband and declared their desire to adopt him. *Id*. at 66.

The foregoing evidence thus supports the findings of the orphans' court with respect to § 2511(b). *See Interest of K.T.*, 296 A.3d at 1109. Hence, we agree with Attorney Hitchings that any challenge to the involuntary termination decree ruling would not have any basis in law or fact.

Finally, our independent review indicates that the record does not contain any potentially meritorious issues overlooked by counsel. *See Flowers*, 113 A.3d at 1250. We therefore grant Attorney Hitchings's request to withdraw pursuant to *Anders* and affirm the underlying termination decree.

Petition of Joseph L. Hitchings, Esquire, to withdraw granted. Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>08/06/2026</u>